Poole v State of New York (2024 NY Slip Op 51293(U))

[*1]

Poole v State of New York

2024 NY Slip Op 51293(U)

Decided on September 3, 2024

Court Of Claims

Vargas, J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and will not be published in the printed Official Reports.

Decided on September 3, 2024
Court of Claims

Roger Poole, Jr., Claimant,

against
The State of New York, Defendant.

Claim No. 136649

For Claimant:
Zaremba Brown, PLLC 
By: Nick Gjelaj, Esq.
For Defendant:
Hon. Letitia James, Attorney General of the 
State of New York
By: John U. H. Blumenstock, Esq., Assistant Attorney General

Javier E. Vargas, J.

This Court having presided over the instant trial on January 8-12 and 16, 2024, heard the testifying witnesses, examined the pleadings and exhibits in evidence, and listened to the arguments raised by counsel during trial, hereby makes the following findings of fact and conclusions of law.
I.
By Claim filed July 23, 2021, Claimant Roger Poole, Jr. (hereinafter "claimant") commenced the instant action seeking to recover monetary damages from Defendant, the State of New York (hereinafter "State"), for injuries he allegedly sustained as a result of a motor vehicle accident involving a New York State Department of Corrections and Community Supervision's (hereinafter "DOCCS") vehicle and employee on November 5, 2020. The DOCCS vehicle driven by the State employee, Alonzo Payton, negligently came into contact with claimant's Lexus sedan at the intersection of Farragut Road and 82nd Street in Brooklyn, New York. Claimant allegedly sustained injuries to his right wrist, left and right shoulders, cervical spine, and lumbar spine as a result of the accident. This Court issued an Order (Vargas, J.), dated [*2]November 23, 2022, on consent, granting the claimant's Motion for Partial Summary Judgment regarding the issue of liability, setting this matter down for a trial on the issue of serious injury and damages. Consequently, this Court presided over a trial on damages, which commenced on January 8, 2024, with the claimant's testimony, then continued on January 9, 10, 11, 12 and 16, 2024. 
At trial, the claimant testified as to his injuries, as well as their impact on his life. Additionally, the claimant called four witnesses to support his damages claim: Dr. Andrew Merola, his treating spinal surgeon; Dr. William King, his treating orthopedic surgeon; Dr. Chirag Shah, his certified Life Care Planner; and Dr. Debra Dwyer, his economics expert. To support its argument that the claimant failed to offer sufficient proof of his lost and future earnings, future medical expenses, and significant pain and suffering claim, the State called the following witnesses: Dr. Ramesh Gidumal, an orthopedic surgeon, who conducted an Independent Medical Examination (hereinafter "IME") of the claimant and reviewed his medical records; and Dr. Douglas Cohen, a neurosurgeon, who conducted a neurological IME and generated a report.[FN1]
During the trial, the following exhibits were entered into evidence, on consent: claimant's exhibits 1 to 35, 37-39, 43-47, as well as State's exhibits A - K.
II.
At the beginning of the trial, on January 8, 2024, the claimant, a 49 year old man, currently living in Brooklyn, testified that he has five children and six grandchildren to date with a GED being his highest level of education (see Transcript ["Tr."] 1/8/24 at 59, 61). Prior to the accident, he testified that he had faced five felony criminal charges and had been in and out of prison between 1992 to 2017 (see id. at 60). After he was released from prison in 2017, the claimant stated that he worked at a Stop & Shop Supermarket in the receiving room, unloading boxes from the trucks and bringing pallets to the floor, for a period of six months in Orange County (see Exh. B, at 16-17; Tr. 1/8/24 at 63, 65). However, he eventually decided to move back to Brooklyn, New York, where he worked for Lifespire, a company that takes care of autistic adults for a probationary period of three months (see Tr. 1/8/24 at 64). While working at Lifespire, he would help and guide autistic individuals to conduct daily activities such as grocery shopping or going to one-on-one therapy sessions (see id.). At the end of his probation, the claimant testified that he was let go because of his criminal record (see id. at 64-65). 
The claimant explained that his last employment was with Good Day Transportation, a company that transports autistic people and/or elderly adults to their doctor's appointments, and he worked there for a total of seven months but had to stop working after contracting COVID (see id. at 66-67). While at Good Day Transportation, the claimant's duties mainly included driving individuals in need, taking them to their doctor's appointments, and physically picking them up with their wheelchairs, then carrying them up or down the stairs if their building did not have an elevator (see Exh. A at 11-12).
Regarding his Claim, the claimant testified that, on November 5, 2020, he was driving his 1999 Lexus sedan after leaving AutoZone (see Tr. 1/8/24 at 68). He was on his way to a [*3]mechanic because he wanted to fix his car to become an Uber Eats driver (see id.). As claimant was driving down on 83rd Street, coming to the intersection of Farragut, heading towards 82nd Street, a blue DOCCS van driven by Mr. Payton failed to stop at the stop sign and struck the driver's side of claimant's vehicle (see id. at 72-73). Additionally, the claimant's deposition testimony reflects that he was traveling under the speed limit of 25 miles per hour when he approached the intersection but that the DOCCS van appeared to be speeding (see Exh. A at 28). Claimant testified that he was wearing a seatbelt and did not turn the wheels in any direction upon impact (see id. at 30; Tr. 1/8/24 at 76).
He testified that the impact "was very heavy," that his body veered to the right as he took the impact, and the vehicle veered right but remained within the lane he was driving on (see id at 73). Due to the severity of the impact, he testified at his deposition that he does not remember what exactly happened immediately after (see Exh. A, at 31). Claimant recalled that when he regained consciousness of his surroundings, he realized he had hit his head, and he was stuck in his car because the driver's side door was not working properly due to the impact (see id. at 39). He remembered Mr. Payton walking over to his car and calling the paramedics (see id. at 33-34). The New York City Fire Department's (hereinafter "FDNY") emergency medical services arrived on the scene and claimant informed them that something hit his head and he could not think (see Tr. 1/8/24 at 75). According to the FDNY Ambulance Summary report, both the claimant's neurological and physical exams came back normal (see Exh. 6). On the scene, the claimant denied back pain, neck pain, numbness or tingling in his extremities, and the ambulance quickly cleared claimant of any serious injuries (see id.).
As a result of the accident, the claimant testified that his car had a "big" dent on the driver's door, scratches that he would not describe as minor, a blown-out window, and a missing rearview mirror on the driver's side (see Tr. 1/8/24 at 74). After emergency services medically cleared him, the claimant called a tow truck to take the car to his grandmother's house (see id. at 77-78). Claimant testified at his deposition that the car was completely inoperable after the accident, and he had to junk it for $600 (see Exh. A at 47). 
Several hours after the accident, the claimant testified that he called a taxi and went to SUNY Downstate Medical Center Emergency Room (see Exh. 7). Relevantly, the Emergency Room Report in evidence showed "mild swelling" over his left eyebrow but found "no midline C-spine tenderness," "no midline vertebral body tenderness," "good strength in bilater[al] upper and lower extremities with normal gait" and "c-spine negative by nexus criteria" (id.). The report further shows that the claimant did not need imaging at the time and the exam did not reveal any sign of serious injuries due to the accident and concluded with no impairments noted after his functional assessment (see id.).
Notwithstanding this report, the claimant testified that the accident causes him to consistently experience severe pain in his neck, constant swelling on his right hand and wrist, swelling and tingling feelings on his right shoulder, severe pain in his upper spine and neck, and extreme pain in his lower back (see Tr. 1/8/24 at 110-115). He claims that he cannot perform basic tasks such as cooking, exercising, and grocery shopping. Additionally, the claimant highlighted the torment of not being able to play football and basketball with his grandchildren or take them to the park: "[i]t's bad enough I let my children down, but then having to let my grandchildren down, it really destroyed me as a person" (id. at113). 
On the next trial date of January 9, 2024, the Court viewed the virtual testimony of Dr. Merola, claimant's treating spinal surgeon, who recorded his trial testimony on January 5, 2024, on the parties' consent. During his direct examination, Dr. Merola testified that he first examined the claimant on March 22, 2021, four months after the accident, and collected his medical history. He recalled the claimant asserting that he started experiencing symptoms and pain in his cervical and lumbar spine because of the accident. Dr. Merola further testified that, prior to his examination, the claimant received conservative treatments such as physical therapy and several percutaneous lumbar discectomies described as procedures that remove part of a herniated disc that is irritating a nerve, providing prompt pain relief on the lumbar and cervical spine to decrease the claimant's symptoms and preventing further nerve damage to the area. Per Dr. Merola, these treatments did not alleviate the claimant's pain or symptoms, resulting in a referral to his office.
In addition to collecting his history, Dr. Merola conducted a physical examination of the claimant, during which, he noticed that claimant had a forward-leaning posture, indicating that he may suffer from lumbar radiculopathy, and palpable spasms in his cervical and lumbar spine with limited range of motion. Specifically, the doctor stated that the range of motion for the claimant's cervical spine was limited to 30 degrees, compared to the normal range of 60 degrees; his flexion, bending forward, was limited to 40 degrees, whereas the normal range is 60 to 70 degrees; his ability to tilt his head to both the left and right side was at 40 degrees, whereas the normal range for both is 60 to 70 degrees. Claimant's ability to rotate his head along with his shoulders, which at a minimum should be 80 degrees on both sides, was 35 degrees on the right and 40 degrees on the left, indicating a significant range of motion deficit of the spine. Dr. Merola stated that claimant had a positive Spurling maneuver test, suggesting he was experiencing radiating pain down his arms and hands, and some sort of irritation on his spine given his abnormal reflexes. 
Regarding the claimant's lumbar spine, Dr. Merola testified that his lumbar extension was limited to ten degrees where the normal range is 60 degrees, along with spasms on his lower back with pain traveling down his legs. The lumbar spine's forward flexion was limited to 35 degrees, where the normal range is 80 degrees; left and right bending were at 30 degrees, where the normal range is 45 degrees for both sides; right rotation of 35 degrees, and left rotation of 30 degrees, where the normal range for both is 80 degrees. Further exams exhibited nerve irritation on the claimant's lumbar spine. Furthermore, Dr. Merola testified that, similar to the numerical results of claimant's range of motion on his lumbar spine, he has limited range of motion on his cervical spine. 
After examining the claimant's lumbar spine Magnetic Resonance Imaging (hereinafter "MRI") films from December 10, 2020, Dr. Merola testified that claimant exhibited herniated discs located within the spinal canal, explaining why claimant was experiencing shooting pains down his legs. Although the results demonstrated some age-based wear, Dr. Merola testified that he believes the herniated discs exhibited on the claimant's back were due to trauma and not age. Considering the claimant's pain levels and previous surgeries, Dr. Merola also examined claimant's electromyography film (hereinafter "EMG") from January 15, 2021, which showed some nerve entrapment in his wrists but did not indicate any severe motor function damage at the time of the test.
Considering his medical history, Dr. Merola testified that he sent the claimant for additional, updated lumbar and cervical spine MRI testing on March 30, 2021. Those films demonstrated that the claimant continued to exhibit compressed nerves on his herniated discs, which suggested to Dr. Merola that the nerve damage was due to the accident. Dr. Merola further stated that the new MRI film also showed the progression of the claimant's spinal damage, as the nerve pain caused anatomical changes to his spine. As a result, Dr. Merola updated the claimant's medical plan by first referring him to a pain management therapist, then recommending an open surgical procedure called lumbar decompression surgery. Dr. Merola performed this surgery on September 7, 2021, and testified that he successfully decompressed radiating symptoms that the claimant was suffering in his limbs. He testified that the surgery did not cure the symptoms because the claimant continued to suffer chronic pain in his neck and lower back due to the nerve damage. 
At the claimant's post-operative appointment on September 20, 2021, Dr. Merola ordered another updated MRI testing to examine the post-operative status of claimant's back. The new films showed continued damage to the claimant's discs and nerves; that his physical examination showed no improvement in the range of motion; and that he observed continued spasms in the claimant's back. Relevantly, Dr. Merola concluded that he believes this damage is permanent and will become progressively worse, leading the claimant to have permanent disabilities in his back. Moreover, Dr. Merola stated his belief that the claimant will need to continue receiving treatment for this damage and may require future spinal surgeries. Lastly, Dr. Merola did not see any medical history or evidence which could have indicated that the claimant suffered the injuries on his back and neck prior to the accident. Dr. Merola admitted that he did not know of the claimant's 2012 emergency room visits for headaches or claimant's history of playing football. Despite these details, Dr. Merola testified his medical opinion remained unchanged.
At cross-examination, Dr. Merola testified that, regarding the claimant's range of motion, the measurement of the degree of flexion on a patient's cervical and lumbar spine involves the doctor physically bending the area until the doctor feels a spasm. He explained that this examination is passive, meaning the doctor manually bends the patient's cervical or lumbar spine into a position where it may create muscle spasms, thereby providing a more accurate and objective range of motion test. In terms of the progressive nature of a patient's injuries, Dr. Merola testified that it depends on the patient's age, physicality, degree of injury, pre-existing conditions, etc. As for the claimant's current situation, Dr. Merola testified that he is a typical patient who has demonstrated evidence that his injuries will get progressively worse. 
In response to the Court's questions, Dr. Merola testified that he does not believe the claimant's previous work history involving heavy lifting of boxes, people and other things would cause the same type of injury to his neck and back to the same degree as the accident (see Tr. 1/11/24 at 10). He testified that given an individual's makeup, a large segment of the population with similar work experience never rises to the level of requiring symptomatic care or treatment (see id. at 11). Dr. Merola further explained that it does not matter what motion of trauma (suddenly moving from front to back or side-to-side) the claimant suffered because the injuries are universally classified as "coupled motion," meaning there is no pure motion in any one given direction (id. at 12). He further explained that if the patient moved front to back or side to side, such motions have rotational components within them, and when the spine is impacted by [*4]coupled motion, it will eventually lead to disc herniations or injuries (see id. at 13). 
On January 10, 2024, Dr. Debra Dwyer, the claimant's economist, testified that she prepared a wage analysis and future medical analysis based on Dr. Chirag Shah's life care report dated August 15, 2022, and she updated it to account for changes with the passage of time (see Tr. 1/10/24 at 23-24)[FN2]
. She began her testimony by explaining that the methodology of her calculations for future cost of health care was based on Dr. Shah's recommendations, which included medical care, therapeutic services, housekeeping, etc. and each respective annual cost and duration of the services (see id. at 25-26 and 29-35). Dr. Dwyer then came up with the cost of care in current dollars, from 2024 to 2051, pursuant to the cost of each service (see id. at 26). She further explained that these rates, which are unique growth rates for each service, were addressed by a 25-year average, a reasonable amount of time to capture all business cycles and inflation rates, provided by the U.S. Bureau of Labor Statistics (hereinafter "Bureau") (see id. at 27-28). Then using the growth rate, Dr. Dwyer testified that she tried to match the closest category of medical care to the Bureau categories to calculate the total future cost of health care (see id.). 
Regarding past and future income loss, Dr. Dwyer testified that she assumed that the claimant was planning to be an Uber Eats driver, and therefore used the average New York Uber driver's yearly income rate in 2021 to begin her calculations, which was $40,610 (see id. at 36). Then, she calculated the total of past and future losses using the 20-year average, annual growth rate of three percent (see id. at 37-39), until the claimant reaches the age of 67, which is the full retirement age under the Social Security system (see id. at 39). Then, the Social Security benefit growth rate after he turns 67 becomes two-point-five percent (see id.).
During cross-examination, Dr. Dwyer admitted that she did not consider and was not aware of the claimant's incarceration and work history when calculating his future income loss (see id. at 61-63). She did not know that, after the claimant's release from prison in 2017 until present, he only worked for approximately 16 months within the past seven years: six months at Stop & Shop, three months at Lifespire, and seven months at Good Day (see id.). Additionally, Dr. Dwyer did not use the Bureau's work life table to differentiate between people who were active in the workforce versus people who were inactive due to an injury (see id. at 48). Dr. Dwyer further testified that she assumed the claimant was truthful in stating he was investing in his car for the purpose of working full-time as an Uber Eats driver (see id. at 65-68). Moreover, Dr. Dwyer explained that the Bureau does not have a specific Uber Eats category, so she used the Bureau's chauffeur, shuttle, and delivery statistics to calculate his potential salary (see id.). More importantly, Dr. Dwyer testified that she does not know the hiring criteria of Uber Eats drivers (see id.).
On the trial date of January 11, 2024, Dr. William King, the claimant's orthopedic surgeon, testified that he saw the claimant for treatment of his shoulder and wrist months after the accident on January 13, 2021 (see Tr. 1/11/24 at 38). Dr. King acknowledged that Dr. Anjani Sinha, an orthopedic surgeon, performed arthroscopic surgery on the claimant's left shoulder prior to his first office visit, and that he did not treat claimant for his left shoulder (see id. at 39). He testified that "[Dr. Sinha's] preoperative diagnosis was a rotator cuff tear, and the [*5]postoperative diagnosis was a left shoulder superior SLAP tear" (id at 40, 41). During the intake, Dr. King explained that the claimant stated that he was undergoing physical therapy for the purposes of pain management and to increase functionality of his shoulders, and denied having any injuries or undergoing surgery prior to the accident (see id. at 51, 52). Per Dr. King, the claimant's physical examination suggested that his "head, neck, chest and abdomen were apparently benign" and he was "alert, oriented and cooperative" (id. at 52-53). At the physical examination, the claimant complained of pain primarily located on his left hip, but Dr. King did not perform any surgeries on that hip (see id. at 53). He confirmed, after reviewing the claimant's left hip MRI dated December 3, 2020, that the claimant does not exhibit any injuries to his left hip (see id. at 54). Dr. King testified that the claimant had trochanteric bursitis of the hip prior to signing the report (see id. at 55).Claimant's second visit was on March 29, 2021, where his primary complaints to Dr. King were discomfort in his lower back, left hip, and his right wrist (see id. at 57). Dr. King reviewed an MRI of the claimant's right wrist, which showed synovitis or swelling of the joint, and some chondral changes [FN3]
of the carpal bones. On April 3, 2021, he performed surgery on the claimant's right wrist where the doctor discovered that claimant had a grade two injury in the area; a postoperative visit was conducted on April 12th, where the sutures were removed and Dr. King observed a clean wound, mild tenderness, but a good range of motion (see id at 58-59, 65).
Thereafter, the claimant's third visit took place on July 26, 2021, where he complained about his left shoulder, right wrist and hand, and his left hip (see id. at 67). Dr. King examined the claimant and diagnosed him as having "cervical sprain, lumbar sprain, left shoulder derangement[,] . . . status post arthroscopy of the right wrist and hand[,] and . . . a left hip derangement" (id. at 67). Claimant's following visit occurred on August 23, 2021, when for the first time the note indicated that he complained primarily about right shoulder pain (see id.). He continued to complain about numbness, tingling and swelling in his hand (see id. at 69). Dr. King testified that "there wasn't much done on the right shoulder other than [the] complaint of tenderness over the [acromioclavicular or shoulder] joint and one of the rotator cuff muscles" (id. at 72). Claimant's "range of motion was minimally affected" despite having a positive O'Brien test, suggesting that there "may be a rotator cuff problem or a labral problem" (id.). After reviewing the claimant's right shoulder MRI, Dr. King testified that the films showed "thickening and increased signal in the distal supraspinatus tendon most compatible with a partial tear" (id. at 73). Dr. King's preoperative diagnosis on the right shoulder was rotator cuff derangement, and he performed surgery on October 9, 2021 (see id. at 74). He testified that the claimant's right shoulder "had a SLAP tear similar to the left shoulder" and he also had "a partial rotator cuff tear, a biceps tendon tear, [and] an extensive hypertrophic synovitis" (id. at 75).
Claimant next visited Dr. King on January 24, 2022, when Dr. King performed a physical exam on his cervical and lumbar spines (see id. at 87). The exam showed some tenderness and spasms in those areas (see id.). Regarding the claimant's right shoulder, Dr. King testified that the incision was well-healed and there was no swelling, redness, or tenderness (see id.). Dr. King further recalled that the claimant's range of motion was only minimally compromised (see id.). [*6]He testified that he ordered an updated right shoulder MRI, which led to the recommendation of a second arthroscopic procedure because the physical therapy was not apparently resolving claimant's complaints (see id. at 89). The second procedure was performed on March 13, 2022, where Dr. King discovered more damage to the area (see id. at 89-91). Interestingly, he testified that these findings were not present in the first surgery (id. at 91). When asked to explain why the damage arose, he stated that "I don't know if the therapy was rigorous. I don't know if there was a sudden active force placed on the shoulder. I didn't get any history of a subsequent injury to the [shoulder]" (id.). He further stated that "sometimes if there's a degenerative process going on, that can continue" (id.).
When queried about the significance of the tears with respect to the two surgeries and that the claimant is right-hand dominant, Dr. King stated "so two procedures, it can cause some compromise to the shoulder in terms of function, pain level and that can progress as chronological progression also goes" (id. at 94). He opined within a reasonable degree of medical certainty that the claimant may require future medical care such as complete rotator cuff repair, then total joint replacement at some point (see id. at 95). In response to inquiries as to whether claimant's right shoulder and wrist injuries rendered him disabled, Dr. King testified only "from certain activities such as any overhead activities, power lifting or repetitive activity with the shoulder" (id.).
Claimant's last visit took place on January 30, 2023, where Dr. King testified that claimant had an examination of his cervical and lumbar spine and his right shoulder revealed well-healed arthroscopic scars, no heat, swelling erythema or crepitus (see id at 96). However, he described the claimant as having a painful arc, meaning his range of motion in moving his arm up and down, was limited (see id.). Dr. King testified that those restrictions "were minimal" on the right and the claimant's left shoulder had improved, and that while these deficits are "probably" permanent, they are "not a significant deficit" (id. at 97). With respect to his right wrist, Dr. King testified that it showed that claimant had a "decreased sensation in his hand, [he] complained of tenderness over the carpal tunnel, [and] he had a positive Tinel sign," reflecting irritation (id. at 98). Within a reasonable degree of medical certainty, "assuming that everything was accurate and truthful," Dr. King opined that the competent producing cause of the condition to the claimant's right shoulder was "secondary to the accident involved in 2020," and that the claimant suffered permanent consequential limitation of the use of his right shoulder (id. at 99, 100). Also, that within a reasonable degree of medical certainty, the tenderness and decreased sensation in the claimant's right wrist was a "direct result of the accident that occurred on November 5, 2020, based on history, physical examination, and the patient had no complaints of right wrist hand pain prior to the accident" (id at 98, 100).
During cross-examination, Dr. King acknowledged that the November 13, 2020 x-ray of the claimant's right wrist reflected an old fracture of his right fifth metacarpal and acknowledged that claimant had prior right-hand surgery (see id. at 103). When he examined the claimant's right wrist on January 30, 2023, his strength was normal (see id. at 121). Tellingly, Dr. King could not opine within a reasonable degree of medical certainty as to the level of decreased sensation in the claimant's wrist or whether his carpal tunnel syndrome was caused by the automobile accident (see id. at 124, 128). When queried with respect to the EMG/NCV study performed in January 2021, which appeared to show carpal tunnel syndrome in both wrists, Dr. [*7]King testified this has medical significance where the patient may have some type of underlying process manifesting itself (see id. at 130).
Dr. King could not opine within a reasonable degree of medical certainty as to whether the impact on the claimant's driver's side would cause an injury to both shoulders (see id. at 133-134). He testified that his opinion is based solely on the timing of the symptoms, the MRI findings and the claimant's complaints with respect to his shoulders (see id. at 134). With the history that was given via the MRI and the physical examinations, Dr. King testified that there was an internal problem in the claimant's shoulders but could not say when the problem arose (see id.).
Next to testify, on January 12, 2024, was Dr. Chirag Shah, the claimant's life care planner, who testified that he examined the claimant on August 10, 2022, and reviewed his medical records containing MRI films and operative reports (see Tr. 1/12/24 at 22). Dr. Shah explained that the examination consisted of a full musculoskeletal and neurologic exam, which involved looking at the patient, their appearance, their skin, etc. (see id. at 27). Through the physical examination, Dr. Shah testified that claimant has visible scars from his prior surgeries and some limitations on his cervical spine, lumbar spine, shoulders, and right wrist (see id. at 27, 28). Dr. Shah opined that, within a reasonable degree of medical certainty, the limitations in the claimant's cervical spine lower back, right shoulder, and wrist are permanent (see id. at 30, 31). He explained, using the same rationale for each body part, that the range of motion limitations in these areas are permanent and significant because most injuries that took place close to two years ago should have already been recovered if they were not significant or permanent (see id. at 32). Additionally, the doctor testified that the degree of limitation that the claimant suffers will impair his functional abilities relating to daily tasks (see id. at 33). 
Dr. Shah next discussed the claimant's proposed life care plan tables which primarily outline the various treatments that he believes that claimant is going to need to treat his injuries in the future (see id. at 40). He explained that the claimant is going to need potential future surgeries, physician visits, office visits, therapy sessions, diagnostic studies, pain management sessions, durable medical equipment and aids, and potential medical procedures, along with the services' frequency, annual cost, modality, and projected total costs (see id. at 41, 43, and 44-46). Dr. Shah testified that all of his calculations are in accordance with the patient's age, demographic, and expected life span, and he explained that the costs of these itemized matters are in today's dollars, where he believes the associated costs are conservative because the proposed life plan includes generic type medications and not brand name costs (see id.).
As for the claimant's ability to work in the future, Dr. Shah testified that he may need a vocational evaluation (see id. at 52). He explained that due to the possibility of future surgeries, the claimant may not be able to return to the workforce by 2025 (see id.). In reviewing the claimant's medical records, Dr. Shah opined that within a reasonable degree of medical certainty he believes that claimant is currently disabled from any manual labor-intensive types of occupations and believes that this may be permanent (id. at 71). 
Upon cross-examination, Dr. Shah candidly admitted that he did not know the claimant's living situation when he included the cost of some home-aid related services, where some services can be done by a building superintendent(see id. at 82). With respect to future medical costs, Dr. Shah testified that he calculated the costs associated with the region where the patient [*8]lives but none of the costs are based on any insurance modalities (see id at 93). Dr. Shah also did not know that the claimant is a Medicaid patient or the differences between the allowable amounts under Medicaid or Medicare and the regional average cost used in the report (see id. at 94). Regarding activities of daily life, Dr. Shah testified that the claimant would be able to perform all daily activities but at a slower pace, although with pain but it would not preclude claimant from completing those tasks (see id. at 99-101). Upon completion of Dr. Shah's testimony, the claimant rested his case in chief.
III.
On January 11, 2024, the State began its defense with its first witness, Dr. Ramesh Gidumal, an orthopedic surgeon who conducted claimant's IME and reviewed his medical records.[FN4]
Dr. Gidumal testified that in preparation for testifying and finalizing his expert report, he examined the claimant on February 7, 2022, along with his medical records, MRI reports, and deposition transcripts (see Tr. 1/11/24 at 173-174).[FN5]
He explained that the examination consists of a physical examination, as well as watching the claimant in the waiting room, observing him in the exam room, and walking with him to different rooms for different examinations (see id. at 179, 180). The purpose of such observations is to watch how the claimant moved freely outside of the medical examination, ensuring his exam's result is consistent with his physicality (see id.). During the physical examination, Dr. Gidumal examined claimant's shoulders, right wrist, and hips (see id. at 181).
With respect to the claimant's shoulders, Dr. Gidumal first observed how the claimant swung his arms when he was walking (see id. at 180-181, 184-185). Then, Dr. Gidumal asked the claimant to sit on the examination table, asked him to undress so that he can examine his range of motions, inspected if there were any scars and atrophy on his shoulders, and checked whether he has any other problems such as impingement signs or arthritis (see id. at 186, 187). After the claimant followed the series of commands, Dr. Gidumal testified that his range of motion was normal and he was using both shoulders equally, indicating there was no sign of atrophy (see id at 187, 188). Dr. Gidumal testified that the range of motion examination is a passive and subjective test, meaning the claimant had control regarding the degree to which he allowed Dr. Gidumal to move his shoulders and arms (see id at 192). Dr. Gidumal further testified that he did not detect any deformities during the examination and the claimant's range of motion is only "slightly limited on both sides to 135 degrees," which is sufficient for the claimant to function normally (id. at 193-194).
Beginning with the left shoulder, Dr. Gidumal testified that the MRI(s) showed moderated degenerative arthritis in the left shoulder, and that this age related degeneration is what caused the limited range of motion (see id. at 196). He opined that, within a reasonable degree of medical certainty, the moderate arthritis was unrelated to the November 5, 2020 motor vehicle accident as one does not develop arthritis within two weeks (see id.). Dr. Gidumal also [*9]testified that the MRI did not reflect any evidence of acute trauma (see id. at 197). He explained that if the claimant suffered an injury due to the accident, the MRI report, shortly thereafter, should have demonstrated swelling, but they did not (see id. at 203). Additionally, Dr. Gidumal testified that his examination showed normal ranges of adduction on both shoulders being 30 degrees; the external rotation being 60 degrees, compared to the normal range of 90 degrees; and the internal rotation being 60 degrees, whereas the normal range is 80 degrees (see id. at 206). Dr. Gidumal concluded that he believes such decreases in functionality were due to preexisting degenerative arthritis (see id. at 207-208).
Dr. Gidumal further opined that, within a reasonable degree of medical certainty, there is no evidence that the claimant sustained any significant or permanent injury to his left shoulder (see id. at 213). Furthermore, "there is no medical evidence that [the claimant] sustained any significant exacerbation of his preexisting degenerative arthritis" regarding his left shoulder (id. at 214). With regard to the claimant's right shoulder, Dr. Gidumal opined that, within a reasonable degree of medical certainty, the claimant had "ongoing degenerative arthritis of his right shoulder with thickening and increased signal within the rotator cuff, and he had two surgical procedures, and between them, he had a limitation in motion" (id. at 219). It was also his opinion within a reasonable degree of medical certainty that "there is no medical evidence that [claimant] sustained any significant or permanent injury to his right shoulder as a result of [the] car accident and consequently, there was no direct causal relationship between [the] car accident and his diminished range of motion of the right shoulder" (id.).
With respect to the claimant's right wrist, Dr. Gidumal first examined the area for any signs of incisions, tenderness, deformity, swelling, or atrophy, in comparison with the measurement of the claimant's left wrist and then examined his range of motion and sensation (see Tr. 1/16/24 at 9). He testified that claimant had an equal range of motion on both of his wrists, indicating that he did not have any limitations, and even though the claimant was complaining of subjective tenderness on the right wrist, he had no objective swelling or deformities (see id. at 9-12). Per the doctor, the claimant did have a diminished grip strength, which suggested he may have suffered from a scaphoid lunate ligament tear (see id. at 18). After evaluating the records, the MRI report, his own findings and Dr. King's findings, Dr. Gidumal opined within a reasonable degree of medical certainty that claimant "had a long-standing tear on his scaphoid lunate ligament and had secondly arthritis, and that's what gave him diminished grip strength" (id. at 18). He explained that Dr. King's findings reflect that the claimant "had synovitis and chondromalacia; chondromalacia is a different word for degenerative arthritis. So Dr. King found [that] [he] had degenerative arthritis in his wrist, so it wasn't just me; it was Dr. King" as well (id. at 18-19). In conclusion, Dr. Gidumal surmised that claimant had preexisting degenerative arthritis; that there is no evidence that he suffered any significant or permanent injury; and that there was no evidence that he suffered any exacerbation of his preexisting degenerative arthritis (see id. at 19-20). 
Upon cross-examination, Dr. Gidumal testified that he only examined the claimant's shoulders, wrists, and hips, but not his cervical or lumbar spine (see id. at 26-27).[FN6]
Dr. Gidumal [*10]acknowledged that he saw no MRI films of the claimant's right shoulder, left shoulder or wrist (see id. at 38). Nor did he review Dr. King's second shoulder operation notes prior to completing his expert report or any of Dr. King's records post-April 2021 (see id. at 48). Dr. Gidumal explained that, even though it is important to have as many records as possible to formulate a medical opinion, the evidence from the emergency room, Dr. King's operative notes, the MRI reports, and the physical examination are sufficient to formulate a medical opinion (see id. at 56).
The State's final witness, on January 12, 2024, was Dr. Douglas Cohen, the neurosurgeon who conducted a neurological IME of claimant. Without reviewing any of the claimant's medical records, on April 7, 2023, Dr. Cohen examined and interviewed him regarding his medical history and the accident (see Tr. 1/12/24 at 143). During the interview, the claimant complained about his cervical and lumbar spine pain, along with headaches (see id. at 144). Then, Dr. Cohen observed the claimant's natural movements, examined his cranial nerves, and conducted some provocative testing on his cervical and lumbar spine (see id. at 145). Furthermore, Dr. Cohen testified that he also checked the claimant's gross mental status, motor strength, reflexes, sensation, and some cerebellar function throughout the physical exam (see id.). 
Regarding the results of the exam, Dr. Cohen testified that the claimant's cerebellar functions and reflexes were within normal ranges. To examine the claimant's motor functions, which are objective tests, Dr. Cohen testified that the claimant has full strength in all tested muscle groups (id. at 162). As for sensation, Dr. Cohen stated the claimant did show some asymmetries; however, they were not entirely consistent throughout the examination, nor were they consistent with results of a damaged nerve root or spinal cord (see id. at 163). Furthermore, Dr. Cohen testified that he did not find any signs of atrophy with respect to the calves, biceps, triceps, and legs, indicating the result suggested against a particular nerve root or spinal cord injury (see id. at 164). With respect to the cervical spine, Dr. Cohen testified that the claimant would experience pain when he moved his neck forward but not backward. Such results, Dr. Cohen concluded, can be non-specific because it may be due to many possibilities, such as spasm, irritation, or arthritis.
Dr. Cohen opined that, with a reasonable degree of medical certainty, the claimant had no objective evidence of any cervical spine and lumbar spine injury at the time of the examination (see id. at 169, 170). Dr. Cohen further opined that he believes that claimant is neurologically intact, indicating that the exam showed no abnormalities that could be ascribed to neurologic causes (see id. at 170). Additionally, Dr. Cohen testified that he does not believe that the claimant would require future neurosurgical treatment (see id. at 191). 
During cross-examination, Dr. Cohen testified that without medical records, he may not be able to formulate an opinion, within a reasonable degree of medical certainty, as to the causation of the claimant's injuries (see id. at 178). However, he explained that it is possible to reach conclusions regarding a patient's deficits and ascribe causality based on a physical exam [*11](see id. at 180-81). Additionally, Dr. Cohen testified that the reason why he did not conduct a range of motion test was that such tests are not necessary to render a neurosurgical judgment (see id. at 183).
With Dr. Cohen's testimony, the State rested its case. At the close of the testimony, upon counsel's application, this Court afforded the parties permission to submit post-trial briefs in lieu of oral summations, which were submitted to the Court on May 7, 2024.
IV.
As per counsel's written summation, claimant contends that, as a result of the accident, he sustained significant and permanent injuries to: his right shoulder, undergoing two arthroscopic procedures; his left shoulder, undergoing one arthroscopic procedure; his right wrist, undergoing one arthroscopic procedure; his cervical spine, undergoing one percutaneous discectomy; and his lumbar spine, undergoing one percutaneous discectomy and one laminectomy without fusion. As a result, the claimant seeks damages from the State totaling $11,996,191.[FN7]
The State, on the other hand, contends by its summation that all of the claimant's injuries predate the accident and are chronic, degenerative conditions. Therefore, the State concludes that they are not causally related to his accident, and that no award should be granted to the claimant for his speculative claims. Arguing the alternative, if the Court rejects the findings of Drs. Cohen and Gidumal, the State contends that an award totaling $735,897 would be fair. In addition to that, the State accepts past medical expenses in the amount of $117,784.29 subject to parameters.[FN8]
This Court agrees with the State in part.
Under New York law, the burden is on claimant to prove, by a preponderance of the evidence, that he or she suffered a serious injury under Insurance Law § 5102(d) and is entitled to a monetary damage award (see Raugalas v Chase Manhattan Corp., 305 AD2d 654, 655 [2d Dept 2003]; Craig Test Boring Co. v Saudi Arabian Airlines Corp., 138 F Supp 2d 553, 560 [SDNY 2001]). In relevant part, "'Serious injury' means a personal injury which results in . . .; significant disfigurement; a fracture; . . .; permanent loss of use of a body organ, member, function or system; permanent consequential limitation of use of a body organ or member; significant limitation of use of a body function or system. . ." (Insurance Law § 5102[d]). To show a permanent consequential limitation of use of a body organ or member, a plaintiff or claimant must present medical evidence of continuing and permanent disability or limitation of use as a result of the accident (see Perl v Meher, 18 NY3d 208, 217 [2011]). And, to establish that the claimed limitation is "consequential," a claimant must demonstrate that it is important or [*12]significant through competent medical evidence (see Toure v Avis Rent A Car Sys., 98 NY2d 345, 357 [2002]). 
Furthermore, to meet this standard, the Court of Appeals has held that a plaintiff/claimant is "required to demonstrate restricted range of motion based on findings both contemporaneous to the accident and upon recent findings" (Perl at 217). Courts have held that curtailed performance of customary daily activities and subjective proof of pain, combined with the objective proof of a significant, permanent loss of range of motion by a medical expert is sufficient to demonstrate permanent injury to the spine in accordance with Insurance Law § 5102(d) (see id., citing Lopez v Senatore, 65 NY2d 1017, 1020 [1985]; see also Gleissner v Lo Presti, 135 AD2d 494, 495 [2d Dept 1987]).
Based on the witnesses' trial testimony, their demeanor and the admitted evidence, the Court finds that the claimant credibly established, by a preponderance of the evidence, that he sustained serious, significant and permanent injuries to his cervical and lumbar spine only as a result of the accident. According to Dr. Merola's testimony, the ranges of motion of the claimant's cervical and lumbar spine are limited to no more than 20%-50% compared to those of normal ranges. Even Dr. Cohen acknowledged that the claimant showed certain "asymmetries" and pain to his lumbar and cervical spines (Tr. 1/12/24 at 163). Despite conservative treatment methods, the medical evidence and testimony established that the claimant's spinal injuries are permanent and will become progressively worse, leading him to having permanent disabilities in his back. Unlike his other claimed injuries, the medical testimony and records regarding his cervical spine amply demonstrate that the claimant went through a prolonged period of physical therapy, painful epidural injections, and eventually surgery, a cervical discectomy on March 7, 2021, performed by Dr. Merola to no avail. More importantly, there is no evidence indicating that the claimant's cervical spine was injured before the accident nor is there any evidence that he sought treatment for any injuries to his cervical spine prior to the accident.
Evidence at trial also showed by a preponderance of the evidence that the claimant sustained severe and permanent injuries to his lumbar spine due to the accident. Specifically, the Court finds that he had lumbar radiculopathy and palpable spasms in his lumbar spine with limited ranges of motion, causing pain from his herniated discs after the accident. As per Dr. Merola, this condition radiates pain down to his legs and impacts his ability to sit or walk for prolonged periods of time. The record also showed that conservative treatment failed to improve the claimant's condition, similar to his cervical spine. Twice, Dr. Merola had to operate on the claimant in an attempt to decrease his symptoms. Dr. Merola first conducted a lumbar percutaneous discectomy on the claimant's L4-L5 and L5-S1 on January 31, 2021. The second procedure, a decompressive lumbar laminectomy, was conducted on September 7, 2021. Nevertheless, the claimant credibly testified that he continues to suffer pain and receive pain management treatment regularly. Similar to his cervical spine, there is no evidence indicating that claimant's lumbar spine was injured before the accident nor is there any evidence of any prior treatment for injuries to his lumbar spine predating the accident. 
Given that the claimant persistently sought and received treatment without significant improvements and without gaps in treatment, the Court is persuaded that he was contending with a new type of physical problem caused by his accident, entitling him to damages. Thus, there is no dispute that the claimant has established a permanent consequential limitation of the use of a [*13]body organ or member at his cervical and lumbar spine through objective proof. Hence, the Court concludes that the claimant has suffered significant limitation and permanent injury to his cervical and lumbar spine under Insurance Law § 5102(d), as a result of the accident, which has engendered some lasting effects including a limitation on his range of motion and weakness. However, the Court has also taken into account the fact that the claimant is not actively pursuing either conservative medical relief or any attempts to find employment. 
The Court further finds, upon reviewing the evidence, that the claimant failed to prove, by a preponderance of the evidence, that he sustained significant and permanent injuries to his shoulders as a result of the accident. Overall, there is no testimony from the claimant or his treating physicians regarding the manner of how he injured his shoulders during the accident. His testimony is deafeningly silent as to this. Medical records from the FDNY emergency medical services and SUNY Downstate Hospital, in the hours after the accident, clearly demonstrated that the claimant only complained about headaches, swelling above his left eye, and neck pain (see Tr. 1/8/24 at 75-76; Exh. 6). The Court is especially confused as to how the claimant could have injured his right shoulder during the accident, given that the impact took place on the driver's side of the car. More importantly, the claimant was engaged in the type of work and lifestyle that could have resulted in an advanced degenerative condition to both of his shoulders, as testified to by the State's experts. Even though there is no evidence indicating that the claimant's shoulders were injured nor of any treatment to them prior to the accident, the Court finds that the claimant failed to establish a direct causal relationship or connection between the injuries to his shoulders and the accident.
This conclusion with respect to the claimant's shoulder injuries is amply supported by the documentary and testimonial evidence. Specifically as to the left shoulder, first, Dr. Gidumal provided uncontradicted testimony that the claimant presented moderate degenerative arthritis and no edema or swelling of the left shoulder on the MRI shortly after the accident (see Tr. 1/11/24 at 207). Second, Dr. Sinha, the claimant's first orthopedic surgeon, who treated his left shoulder and performed that shoulder's surgery, was not brought in to testify at trial (see Exh. l7). Instead, the claimant asked Dr. King, his treating physician, to testify to the left shoulder injuries solely based on Dr. Sinha's operative reports, the initial physical examination results performed by Dr. King's Physician Assistant ("PA"), and the MRI films. Third, the left shoulder operation was performed merely five weeks after the accident, indicating to this Court that the claimant rushed into surgery without any causal relationship to the accident or any real attempt at conservative treatment such as physical therapy. Lastly, Dr. Sinha's operative report clearly indicated a 1.7 cm cyst within his left shoulder, which the Court believes is evidence that the claimant had a preexisting condition (see Exh. 17). Hence, the Court is not convinced that the alleged injuries to the claimant's left shoulder were due to the accident, but that instead such injuries resulted from his own degenerative conditions and the cyst highlighted on the MRI report, as opined by Dr. Gidumal (see Tr.1/11/24 at 188, 207-208, 213, 219).
Similarly unpersuasive are the claimant's allegations about injuries to his right shoulder resulting from the accident. The Court notes that the claimant first complained about his right shoulder to Dr. King's PA on August 23, 2021, almost ten months after the accident, suggesting to this Court that his right shoulder injuries are not causally related to the accident. Second, after Dr. King performed the second arthroscopic surgery in 2022, he discovered more issues with the [*14]right shoulder area which were not present in the first surgery. When asked to explain why those additional damages arose, he hedged that it may have been because therapy was rigorous and did not know if there was a sudden active force or a subsequent injury after the surgery and hinted as to a continuing degenerative process. In response to inquiry with respect to the significance of the tears after the two surgeries, Dr. King explained that the two procedures may have caused some compromise to the shoulder in terms of function and pain level. Such testimony has led the Court to believe that the pain the claimant suffered was due to an advanced degenerative condition similar to that in his left shoulder rather than a product of acute trauma. 
Third, during cross-examination, Dr. King could not opine within a reasonable degree of medical certainty as to whether the impact on the claimant's driver's side could cause an injury to both shoulders. He based his opinion solely on the timing of the symptoms, the MRI findings and the claimant's complaints with respect to his shoulders. With the history that was given via the MRI and the physical examination, Dr. King testified that there was an internal problem in the claimant's shoulders but could not ascertain when the problem arose. With this record, it is clear that the claimant did not prove by a fair preponderance that his right shoulder injury was indeed due to acute trauma, rather the evidence supports a finding that the condition in his right shoulder is due to degenerative conditions or to some sort of compromise to the functioning of his right shoulder after the two procedures were performed within three months of each other in 2021 and 2022. 
Nor did the claimant prove, by a preponderance of the evidence, that he sustained injuries to his right wrist as a result of the accident. Dr. King testified that he treated and performed surgery on claimant's right wrist in 2021; however, during cross-examination, Dr. King admitted that he cannot fully determine whether the injuries to the claimant's right wrist were indeed due to the accident without further medical evidence. Furthermore, Dr. King revealed that the claimant's right wrist 2020 MRI, showed a healed fracture to his right hand and wrist. Especially given the fact that the claimant had consistently denied having preexisting conditions and prior injuries to his shoulders, wrists, back, and neck, the Court cannot credit the claimant's testimony relating to his alleged injuries and instead credits the State's expert, Dr. Gidumal's testimony as more credible. Considering the manner in which the claimant's car was hit on the driver's side and his work and lifestyle history, the Court finds that the claimant did not suffer an injury to his right wrist but instead suffers pain due to a previous injury as shown on the MRI film.
V.
Given the establishment of the serious injury threshold, the Court finds, based upon a preponderance of evidence, that the claimant is entitled to an award of non-economic loss to justly and fairly compensate him for the injuries he sustained as a result of his accident. It is well established that "the court may grant any type of relief within its jurisdiction appropriate to the proof whether or not demanded, imposing such terms as may be just" (CPLR 3017[a]). When deciding on an award of damages to a person injured by the negligence of another, the objective is to compensate the victim, not to punish the wrongdoer, and "restore the injured party, to the extent possible, to the position that would have been occupied had the wrong not occurred" (McDougald v Garber, 73 NY2d 246, 253-54 [1989]).
With respect to the lost earnings claimed by the claimant, it is well settled that it is the claimant's burden to establish "damages for past and future lost earnings with reasonable [*15]certainty, such as by submitting tax returns or other relevant documents" (Papa v City of New York, 194 AD2d 527, 531 [2d Dept 1993 (internal citation omitted)]; see Lodato v Greyhawk N. Am., LLC, 39 AD3d 494, 496 [2d Dept 2007]; Johnson v The State of New York, UID No. 2008-030-002 [Ct Cl, Scuccimarra J., Feb. 4, 2008]). "Testimony alone, without documentary evidence such as tax returns or pay stubs is generally insufficient as a matter of law" (Johnson at *7; see Ramirez v City of New York, 279 AD2d 563 [2d Dept 2001]; Gomez v City of New York, 260 AD2d 598 [2d Dept 1999]). In the present case, it is undisputed that the claimant was in and out of prison between 1992 and 2017, and he does not have any employment history between that 25-year period. Other than the claimant's own indication that he worked approximately six months at Stop & Shop, three months at Lifespire, and seven months at Good Day Transportation, after his release from prison in 2017, there was no documentary or any other showing of his past ability to earn a stable salary for a long period of time. Claimant offered no tax returns, pay stubs, or W-2 forms evidencing that minimal employment. Furthermore, although the claimant testified to his intentions of becoming an Uber Eats driver prior to the accident, he has offered no proof of making such an effort except for allegedly making changes to his Lexus, which could have been equally made just to keep his car in working order. Claimant also admitted that he has not been seeking employment after the accident given his injuries. Since the claimant failed to meet his burden of proof, he is, as a matter of law, not entitled to recover damages for past or future lost earnings (see Lodato, at 496; Karwachi v Astoria Med. Anesthesia Assoc., P.C., 23 AD3d 438, 439 [2d Dept 2005]).
It is well established that "[a]wards of damages for past and future medical expenses must be supported by competent evidence that determines the need for, and the cost of, medical care" (see Chung v Shaw, 175 AD3d 1237 [2d Dept 2019], quoting Pilgrim v Wilson Flat, Inc., 110 AD3d 973, 974 [2d Dept 2013]). Evidence submitted by the claimant, his expert reports, and his expert testimony at trial suggested that his past medical care totaled $117,783.29 (see Exh. 23-24, 31-33). The Court finds that, among all the alleged injuries, only the claimant's cervical and lumbar spinal injuries were indeed caused by the accident. Given the procedures and treatment to the cervical and lumbar spine injuries only account to less than half of the medical procedures the claimant underwent, the Court has decided to award a total of $59,000 for past medical expenses  while less than what was requested from the claimant, it accounts for approximately half of such amount.
It is important to note that evidence submitted at trial suggesting that the claimant may incur medical expenses for treatment when and if future conditions develop, appears to be speculative and does not support an award of damages for future medical expenses (see Pilgrim at 974). At trial, Dr. Shah presented and testified to the claimant's future medical needs due to his related injuries. Given that the Court has determined that the claimant only suffered severe injuries to his lumbar and cervical spine, the Court will decrease Dr. Shah's recommendation for future medical care, supportive care, medication, equipment and their frequencies pertaining only to the spinal injuries. Furthermore, because all of the recommended spinal surgeries for the claimant are conditional based upon the failure of conservative treatments, the Court rejects all of the probable and potential spinal surgical interventions suggested by Dr. Shah.
However, Dr. Shah testified at trial and his expert report stated that the claimant may need numerous conservative treatments, especially because of his numerous injuries and past [*16]surgical interventions (see Exh. 22). If all of those treatment plans fail to eliminate the claimant's complaints, he may need future surgical interventions to alleviate his symptoms and pain. Upon reviewing the evidence and trial testimonies, the Court only agrees with the following suggestions by Dr. Shah on the claimant's future medical needs, at diminished frequencies and pertaining only to his cervical and lumbar spine: physical therapy, fitness trainer with access to aqua therapy, diagnostic studies, pain management trials, and medical trials for his cervical and lumbar spine. The Court also agrees with Dr. Shah's suggestion that the claimant, reporting significant sadness, frustration, and depression since his accident, would benefit from seeking psychiatry quarterly for one year followed by semiannually for one year. However, the Court is hesitant on granting future costs for revision surgery, given that the surgeries would only take place if all suggested conservative measures failed to address the claimant's complaints. After considering all evidence and circumstances, the Court will award $72,000.00 for future medical needs.
For claimant's other related medical needs, the Court recognizes Dr. Shah's expert report, dated February 8, 2023, was written prior to expert testimonies regarding the claimant's current ability to conduct daily activities and prior to his updated living situation. Dr. Shah's original report contained numerous adaptive aids, mobility devices, durable medical equipment, and extensive home-based services that the claimant will no longer need due to his current circumstances. Significantly, numerous doctors testified to the claimant's ability to conduct most, if not all, daily activities despite his limitations. Claimant testified himself that he is currently living with his grandmother and has been receiving regular support from other family members to improve his quality of life. However, the Court takes into consideration that the claimant's grandmother is very limited in her ability to help him in his daily activities given her age and therefore has granted housekeeping services. The Court also notes that given the claimant's deteriorating condition with his back and neck, he should receive home health aide services after reaching the age of 65. Upon reviewing the evidence and trial testimonies, the Court agrees with the necessity of some of the durable medical equipment and adaptive aids to assist claimant given his injuries to his cervical and lumbar spine. Hence, the Court will award $192,000.00 for these needs. In conclusion, the Court awards $264,000.00 for future medical expenses and other related needs.
VI.
As previously found, the Court believes that the claimant suffered damages comprised of past and future pain and suffering only relating to his lumbar and cervical spine injuries. An award for pain and suffering is a question of fact and will not be disturbed unless it "deviates materially from what would be reasonable compensation" (CPLR 5001[c]; see Borowiak v Kwitzer, 261 AD2d 916, 917 [4th Dept 1999]). Because pain and suffering awards are "not subject to precise quantification, examination of comparable cases is necessary to determine whether the award materially deviated from reasonable compensation" (Nolan v Union Coll. Trust of Schenectady, NY, 51 AD3d 1253, 1256 [3d Dept 2008], quoting Acton v Nalley, 38 AD3d 973, 976 [3d Dept 2007]). Moreover, awards for pain and suffering are not subjected to a precise calculation and the "factors to be considered . . . include the nature, extent and permanency of the injuries, the extent of past, present and future pain and the long-term effects of the injury" (id.). "It is relevant to consider the impact on the enjoyment of life, the ability to [*17]perform typical daily tasks and previously enjoyable activities, and the overall impact of the injuries" (Richardson v State of New York, UID No. 2022-018-339 [Fitzpatrick, J., Nov. 3, 2022]; see Agness v State of New York, UID No. 2019-018-056 [Fitzpatrick, J., Sept. 11, 2019]).
Here, in determining the measure of the claimant's past pain and suffering, the Court is persuaded that, immediately after the accident, he experienced pain and injury to his cervical and lumbar spine. Such injury required the claimant to undergo physical therapy, epidural steroid injections on his lumbar and cervical spine, percutaneous discectomy procedures, and a decompressive lumbar laminectomy. There is no doubt that the claimant's spinal injuries caused him to experience severe pain in the months following the accident and he has been in active recovery for the past three years. Evidence and testimony have shown that the claimant will experience intermittent pain to some degree and limitation of movement in the future. More importantly, such pain is not managed by pain medication but is managed through physical therapy and may require further operative procedures. Claimant also testified that he left his fiancé because he did not want her to suffer with him due to the unbearable pain he endured throughout the beginning months after the accident.
However, regarding the claimant's future pain and suffering, even given his injuries, claimant's treating physician, and the State experts testified that he will be able to conduct most, if not all, daily activities, only at a slower rate. Claimant's experts further opined that he is not precluded from working and driving given his injuries; however, the claimant has never sought out vocational rehabilitation or any type of employment ever since the accident. It is noteworthy that the claimant testified that he desired to become an Uber Eats driver immediately prior to the accident; nonetheless, he did not attempt to continue pursuing this employment even after his doctors cleared him to drive or work at non-labor-intensive jobs. Additionally, the claimant is currently living with his grandmother, and will receive support from other family members.
Given the permanent and progressive nature of the claimant's cervical and lumbar spine injuries and having reviewed all the evidence and listening to the experts testify, the Court finds that the claimant has suffered damages resulting from the accident for past pain and suffering in the amount of $500,000; and future pain and suffering in the amount of $500,000 (see Quackenbush v State of New York, UID No. 2012-013-028, [Ct Cl, Patti, J., June 19, 2012] [$154,750 awarded for past pain and suffering and $467,250 for future pain and suffering for cervical spine injuries requiring surgery, left elbow with surgery, and left knee]; Vingo v Rosner, 29 AD3d 896 [2d Dept 2006] [$180,000 for past pain and suffering and $375,000 future pain and suffering to car accident plaintiff who sustained injuries to his right knee with surgery; his cervical and lumbar spine with multiple disc herniations requiring multiple cervical fusions and discectomies]; Van Ness v New York City Tr. Auth., 288 AD2d 374 [2d Dept 2001] [$200,000 for past pain and suffering and $400,000 for future pain and suffering for knee and back injuries]; Borowiak, 261 AD2d at 916-917 [$500,000 awarded for past and future pain and suffering to motor vehicle accident plaintiff with neck fracture with permanent pain and limitation]).
Accordingly, claimant is awarded damages as follows:
1. Past pain and suffering: $500,000.00
2. Future pain and suffering: $500,000.00
3. Past Medical Expenses: $59,000.00
4. Future Medical Expenses: $264,000.00
5. Past lost wages $0.00
6. Future lost wages $0.00; for a TOTAL damages award of $1,323,000.00.
Since the amount of future damages exceeds $250,000, a structured judgement is required pursuant to CPLR 5041(e). Accordingly, the Court directs that judgment be held in abeyance pending a hearing pursuant to CPLR Article 50-B. The Court encourages the parties to agree upon the discount rate to be applied and to formulate a structured settlement of their own (see CPLR 5041[f]). In the event that the parties fail to reach agreement, each party shall submit a proposed order directing judgment in writing conforming to the requirements of CPLR Article 50-B within 120 days of service of this decision upon them by the Clerk of the Court.
New York, New York
September 3, 2024
Hon. JAVIER E. VARGAS
Judge of the Court of Claims

Footnotes

Footnote 1:Upon an in limine motion prior to the commencement of the claimant's testimony, this Court issued an order after oral motion by claimant's counsel, limiting Dr. Cohen's testimony to the four corners of his report (see claimant's transcript at 13).

Footnote 2:Dr. Dwyer's testimony was taken out of order.

Footnote 3:"Chondral" changes, or chondral injuries, refer to damage to the articular cartilage, which is the "cartilage" that lines the ends of the bones (Stedman's Medical Dictionary 340 [27th ed 2000]).

Footnote 4:Dr. Gidumal testified out of turn on January 11, 2024, and continued his testimony on January 16, 2024.

Footnote 5:It was elicited during his testimony that Dr. Gidumal did not review the underlying MRI films themselves in preparation of the IME; he only reviewed the MRI reports.

Footnote 6:During cross-examination, it was revealed that Dr. Gidumal was testifying from a different, more recent report, and not the report in evidence marked as Exh. K (see id. at 31). He confessed that the difference between the two reports would be the findings as to claimant's right shoulder because the State provided him with more medical records two weeks before trial (see id. at 33). Upon the claimant's objection, the Court ruled that Dr. Gidumal could only testify with respect to the report viewed by the Court and all parties which appeared on the screen (see id. at 35; Exh. K).

Footnote 7:Specifically, the claimant seeks the following: past medical expenses of $117,784; future medical expenses of $1,518,309 (29.2 years); lost wages of $125,521; future lost wages of $1,234,577 (29.2 years); past pain and suffering amounting to $3,000,000; and future pain and suffering of $6,000,000 (29.2 years). 

Footnote 8:This alternative figure proposed by the State is comprised of: $235,897 for future medical expenses; $300,000 for past pain and suffering; and $200,000 for future pain and suffering. The State accepts the claimant's number of $117,784.29 for past medical expenses, subject to either a hearing concerning collateral source payments and monies forgiven by providers or an agreement for some adjustment as described by the claimant's counsel.